UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:

_____
                                                            )
BRENDON PEAK                                  )
                                                            )
                    Plaintiff                          )
                                                            )
vs.                                                       )
                                                            )
TIGERGRAPH, INC., GRAPHSQL, INC.,   )
d/b/a TIGERGRAPH, TODD BLASCHKA   )
and YU XU                                          )
                                                            )
                    Defendants                       )
_____)

## COMPLAINT AND JURY CLAIM

NOW COMES Brendon Peak, the plaintiff in the above-entitled action, and hereby states as follows:

### Statement of Subject Matter Jurisdiction and Venue

1.        This is an employment related action for breach of contract, breach of the covenant of good faith and fair dealing, civil conspiracy, tortuous interference with contractual relations, and violations of the Massachusetts Wage Act.

2.        The unlawful practices were committed in the Federal District of Massachusetts, this Court's judicial district, and/or have caused damage to the plaintiff in this District.

3.        This Court has Jurisdiction over this matter because the parties to this action are of diverse citizenship within the meaning of 28 U.S.C. 1332.

4.        The amount in controversy is significantly well over seventy-five thousand ($75,000.00), and approximates $35,000,000.00 after the Massachusetts Wage Act's mandatory treble damages provisions are applied.

5.      Venue is appropriate in this Court in Massachusetts because the plaintiff is a Massachusetts resident, was employed by the defendants in Massachusetts and has sustained all of his damages in Massachusetts, and because Massachusetts has the most significant relationship and interests in this action.

### Parties

6.      Plaintiff Brendon Peak ("Mr. Peak") is an individual of 2 Captain Thomson Lane, Hingham, Massachusetts.

7.      Defendants TigerGraph, Inc. and GraphSQL, Inc., both d/b/a TigerGraph (hereinafter together to as "TigerGraph") are foreign corporations incorporated in the State of Delaware, with a principal place of business in Redwood City, California, and do business in the Commonwealth of Massachusetts, and do business as "TigerGraph."

8.      Defendant Todd Blaschka is an individual of 2226 Kamp Court, Pleasanton, California.

9.      Defendant Yu Xu is an individual of 2516 Somerset Drive, Belmont, California, or of 707 Shell Boulevard, Foster City, California.

### Facts Common to All Counts

10.      In December, 2017, TigerGraph recruited Mr. Peak, an experienced sales professional with a history of multi million dollar transactions.

11.      TigerGraph was and is a start up Information Technology company who customized its novel graphing and reporting technology and applications for its clients.

12.       TigerGraph enticed Mr. Peak to join with a very attractive offer which included a base salary and a lucrative commission compensation plan.

13.     TigerGraph offered Mr. Peak a compensation plan which included commission based on total contract value for each transaction he obtained on TigerGraph's behalf.

14.     Together with escalators TigerGraph offered as part of its commission compensation plan it offered to Mr. Peak, commissions had potential to get as high as 20% of contract value.

15.      On or around January 8, 2018, Mr. Peak entered into an agreement to work as a sales manager for TigerGraph.

16.     Despite objection from Mr. Peak, TigerGraph's employment agreement included a provision that California law would apply to any disputes between the parties, and that California courts would retain jurisdiction of any such dispute, despite that Mr. Peak was a Massachusetts resident and would do all of his work on TigerGraph's behalf in Massachusetts.

17.     TigerGraph's employment contract and its choice of law and jurisdiction provision was an adhesion contract which was not amenable to revision, negotiation or modification; TigerGraph confirmed to Mr. Peak that this provision and agreement was "boilerplate" standard language that was not open to discussion or negotiation.

18.     In early 2018, subsequent to the time when Mr. Peak and TigerGraph executed Mr. Peak's employment contract and Mr. Peak began working for TigerGraph, TigerGraph and Mr. Peak entered into a written compensation agreement consistent with the parties verbal agreements made during the recruiting process.

19.     The compensation agreement of 2018 provided in relevant part:

        a. included a quota of $1,300,000.00 of total contract value per year.

        b. included that Mr. Peak would be compensated for commissions based on total contract value even if the contract was not fully payable by the TigerGraph client in the year of execution.

c. escalators for commissions beginning at 11.5% of total contract value and maximized at 20% of total contract value.

20.    The compensation agreement of 2018 was an agreement made subsequent to Mr. Peak's employment agreement and did not include any choice of law or jurisdiction provisions.

21.    Upon starting to work for TigerGraph, it became clear to Mr. Peak that most contracts to that point in time by TigerGraph's sales force were smaller contracts in the five and low-six figure total value range.

22.    Mr. Peak concluded that in order to meet TigerGraph's quota and to realize the true value of TigerGraph's 2018 compensation agreement, he would need to work on "enterprise" or much larger transactions.

23.    At the beginning of April, 2018, Mr. Peak began to build and develop a business relationship with Optum/United Health Group ("Optum"), an international, multi-billion dollar health care organization.

24.    As of the time Mr. Peak began developing a business relationship with Optum, TigerGraph had absolutely no relationship or communication with Optum.

25.    Mr. Peak developed a business relationship with multiple individual decision-makers at Optum including in Optum's Information Technology Advanced Technology Group.

26.    Mr. Peak built a strong business relationship with Optum's decision makers and worked to discover Optum's needs as it pertained to Graph Databases, the technology platform offered by TigerGraph.

27.    Optum's representatives expressed to Mr. Peak that there were dozens of use cases inside of Optum for TigerGraph's applications.

28.    Throughout 2018, Mr. Peak continued to build and develop a business relationship with multiple individual decision makers at Optum which continually grew stronger with more and more effort put forth by Mr. Peak.

29.    Optum's representatives outlined to Mr. Peak the steps to come for the formalized evaluation process of TigerGraph and consideration of TigerGraph on behalf of Optum.

30.    Mr. Peak's representatives at Optum discussed with Mr. Peak that there would be a Request for Proposal ("RFP") in approximately August of 2018.

31.    Through Mr. Peak's sole efforts, Optum provided him with a strong plan and roadmap of what it would take for TigerGraph to be the eventual winner of the RFP process based on the criteria of requirements that they had and ensuring that TigerGraph aligned to those criteria.

32.    On or about December 1, 2018, Optum communicated to Mr. Peak and TigerGraph that they were selected as the winner of the RFP process and that Optum intended to begin the contracting process with TigerGraph.

33.    At that time, Optum also communicated to Mr. Peak and TigerGraph that they were planning to start with an approximate three year, three million dollars ($3,000,000.00) per year contract;  additionally, TigerGraph submitted to Optum a three year, nine million dollar Request for Proposal ("RFP") response and TigerGraph was awarded as the winner of the RFP.

34.    Based on the 2018 compensation agreement with TigerGraph, a three year, three million dollars ($3,000,000.00) per year contract with Optum would have yielded commission in the approximate amount of $1,696,000.00; for Mr. Peak to receive compensation as a commission, the next step requires a negotiation of a signed agreement between TigerGraph and Optum.

35.    Negotiations between Mr. Peak on behalf of TigerGraph and Optum began with the TigerGraph Master Services Agreement ("MSA").

36.    The MSA is a comprehensive written agreement between TigerGraph and TigerGraph clients such as Optum.

37.    The MSA would regulate the business relationship between Optum and TigerGraph.

38.    Once this MSA is executed by the parties, the relationship between TigerGraph and its client and the sale, are complete; however, as is customary in the complex world of software sales, the MSA is followed by a series of Statements of Work ("SOW"), also known as Purchase Orders ("PO").

39.    Optum expressed to Mr. Peak that they would begin with a three year SOW for three million dollars ($3,00,000.00) per year through an accepted RFP response and in written and verbal communication(s).

40.    Mr. Peak shared Optum's plans to begin with a three-year SOW for three million dollars ($3,00,000.00) per year with Todd Blaschka, his manager at TigerGraph and with TigerGraph in December, 2018.

41.    In December, 2018, as the negotiations with Optum and TigerGraph were underway in earnest and Mr. Blaschka and TigerGraph realized the amount of commission that would be payable to Mr. Peak for building and creating TigerGraph's relationship and contracts with Optum, Mr. Blaschka and TigerGraph abruptly announced that Mr. Peak's and other sales representatives 2018 compensation plan would be replaced with a new agreement.

42.    Mr. Blaschka and Mr.  Xu announced a compensation plan for 2019 that dramatically reduced commissions for Mr. Peak.

43.    Mr. Blaschka and Mr. Xu and TigerGraph developed a far less lucrative compensation plan for Mr. Peak and others as a direct response to Mr. Peak's successful efforts at selling the Optum

deal and building and developing TigerGraph's business and contracts with Optum, specifically to avoid paying commissions to Mr. Peak and to result in an unearned windfall to TigerGraph.

44.     In late 2018 or early 2019, well after Mr. Peak developed the relationship yielding the December 2018 MSA with Optum, Mr. Blaschka and TigerGraph issued the new, replacement, 2019 compensation plan with no opportunity for negotiation.

45.     The 2019 compensation plan fundamentally changed the compensation agreement with which TigerGraph solicited Mr. Peak to work for TigerGraph and with the 2018 compensation agreement.

46.     Under the 2019 compensation plan, quota attainment was no longer based on total contract value, but would now be Annual Recurring Revenue.

47.     Mr. Peak was hired based on the 2018 compensation plan which was the key selling point and the reason Mr. Peak joined TigerGraph in 2018, because of the lucrative nature of the compensation plan.

48.     Mr. Peak built the Optum business deal to take advantage of the benefits of the 2018 compensation plan.

49.     Once it became clear to Mr. Blaschka and Mr. Xu that Mr. Peak was going to achieve and realize the significant benefits of the 2108 compensation agreement and plan with which they hired him, it was at that point that they changed the plan.

50.     Furthermore, under the 2019 compensation plan, only the first year of a multi-year contract would count towards quota attainment and accelerators would only be based on year one.

51.     This was not the plan that Mr. Peak was recruited to join TigerGraph and this was not the deal structure that he had consummated with Optum.

52.    TigerGraph intentionally and in bad faith or without good cause changed the compensation to Mr. Peak based upon his pending successes with Optum in order to deprive him of the benefits of the 2018 compensation agreement and yield a windfall to TigerGraph.

53.    Under the 2019 compensation agreement, commissions for years two and three of a contract would be capped at one-half of the year one commission payout of $11.5%.

54.    The defendant's replacement of the 2018 compensation agreement with the 2019 compensation agreement, if lawful, would have resulted in an approximate $1,000,000.00 reduction of commissions payable to Mr. Peak.

55.    Finalization and negotiation of the December 2018 MSA, a complex, lengthy document between TigerGraph and Optum continued in to early 2019.

56.    In April, 2019, discussions between TigerGraph and Optum were finalized and resulted in an executed MSA and the first SOW.

57.    The SOW of April 2019 represented over seven hundred eight seven thousand dollars ($787,000.00) in license revenue for TigerGraph, a strong beginning for closed business between TigerGraph and Optum.

58.    Optum represented TigerGraph's first and only enterprise customer and Optum was clear that there would be many more SOWs to come.

59.    In the summer of 2019, several Optum representatives and decision makers met with defendant Todd Blaschka and TigerGraph's largest investors and discussed Optum's intent to enter into business with TigerGraph valued at twenty million dollars ($20,000,000.00) per year.

60.    However, despite that important detail of the relationship and their growing business dealings, Mr. Blaschka did not inform Mr. Peak of the meeting with Optum decision makers and TigerGraph's largest investors or of Optum's intent to enter into business with TigerGraph valued

at twenty million dollars ($20,000,000.00) per year; rather, Optum's representatives informed Mr. Peak of that meeting; Mr. Blaschka' s actions in this regard represented an employer unfairly and deceptively withholding valuable sales intelligence from Mr. Peak, its employee with intent to deprive Mr. Peak of the benefits of his employment and compensation agreement with TigerGraph.

61.    The Summer 2019 meeting between Mr. Blaschka and Optum decision makers and TigerGraph's largest investors and Optum's declaration of its intent to enter into business with TigerGraph valued at twenty million dollars ($20,000,000.00) per year was the basis for a second round "Series B" of investment in TigerGraph valued at approximately $32,000,000.00.

62.    Mr. Peak later learned from Optum, that a TigerGraph investor was debating whether or not to re-invest with TigerGraph; it was at that point that Optum expressed its intent to enter into business with TigerGraph valued at twenty million dollars ($20,000,000.00) per year.

63.    Optum's expression to TigerGraph and TigerGraph's investors of its intent to enter into business with TigerGraph valued at twenty million dollars ($20,000,000.00) per year was the main reason and basis for the "Series-B" investment in to TigerGraph,

64.    By reason of Mr. Peak's successful creation and development of Optum as TigerGraph's largest client, Optum had also become its strongest endorsement, which endorsement allowed for other successful sales efforts by TigerGraph's sales force.

65.    As of December, 2019 Mr. Peak closed four separate SOWs with Optum, which represented over $1,950,000.00 in total contract sales.

66.    Mr. Peak had quickly became the top sales representative at TigerGraph in terms of Total Contract Value bookings, the basis for which he was hired.

67.     As the Covid-19 pandemic struck in early 2020 with its resulting economic fallout, Mr. Peak's relationship with Optum continued to grow and expand.

68.     Mr. Peak completed  a transaction with Optum in December 2019 valued at over $1,000,000.00 and entitled "M&R: Member Journey", which came with a requirement and condition that the application be successfully running inside of Optum (a/k/a "Go-Live")  by March 31, 2020.

69.     Mr. Peak worked closely with TigerGraph's technology department members to ensure the March 31, 2020 deadline was met.

70.     As a result of Mr. Peak's efforts, Optum's M&R Member Journey project was able to be consummated as Tiger Graph was able to deliver the working application by Optum's deadline.

71.     As a result of the strength and trust of the relationship Mr. Peak created and developed with Optum, Optum's executives praised Mr. Peak and his efforts and TigerGraph's products, which helped to organize medical data effectively for Optum, including to help combat the effects of the pandemic.

72.     More importantly, the successful Go-Live of M&R Member Journey built credibility with Optum and meant that there would be many more transactions with Optum to come.

73.     The successful Go-Live M&R Member Journey transaction meant that Mr. Peak could quickly begin the process of realizing commissions on the "$20,000,000.00 per year" business vision that Optum had expressed to TigerGraph leadership and TigerGraph investors.

74.     In the spring of 2020, Optum executives and Mr. Peak's main business contact at Optum provided Mr. Peak with a  "graph portfolio" document which outlined over 20 projects Optum was ordering with TigerGraph.

75.     The spring 2020 graph portfolio represented over $14,500,000 in Total Contract Value business.

76.     The spring 2020 graph portfolio document was merely the beginning of Optum's path to $20,000,000.00 per year and the customer went through the efforts of detailing these first 20 or more projects.

77.     The graph portfolio of spring 2020 outlined with specificity the name of each project, its percentage for being consummated, and projected dates and size of the transaction.

78.     Optum rated many of the percentages for being consummated in 2020 were at 80% or 90% likelihood.

79.     The spring 2020 graph portfolio document made it clear that Mr. Peak was indeed bringing to fruition over 20 projects valued at least $14,500,000.00 in business between Optum and TigerGraph and that Optum was firmly on the path to closing its stated and projected $20,000,000.00 per year in contracts with TigerGraph.

80.     Mr. Peak and his main contact at Optum met regularly and updated the graph portfolio and to review the existing contracts and the ones to be finalized; as of May 2020, the nature of the relationship with Optum had moved into more on from a sales relationship to one with an existing client and account management role.

81.     Well into the later part of spring 2020, Mr. Peak continued to successfully expand the relationship he had created between TigerGraph and Optum.

82.     During the process of Mr. Peak and Optum continually meeting and updating the graph portfolio of business between TigerGraph and Optum, which continued to grow successfully due to Mr. Peak's efforts, Mr. Blaschka also was privy to the drafts of the graph portfolio.

83.     On May 11, 2020, Mr. Peak received the final graph portfolio update from Optum.

84.     On the May 11, 2020 graph portfolio document   projected the percentage (likelihood of completion) for Optum's "MBM Member Journey – Cancer" project was at 100%, while the remainder of the remaining projects were now at 80% and above, with many at 90%.

85.     On May 13, 2020, Mr. Peak received approval for the first of the 20 graph project SOWs from Optum and sent the signed SOW for Optum's "MBM Member Journey – Cancer" project to his manager and to Mr. Blaschka for execution.

86.     Mr. Blaschka, did not reply to Mr. Peak with the executed SOW as would have been normal protocol for a completed piece of business with a client such as Optum.

87.     On May 14, 2020, Mr. Peak's manager summoned Mr. Peak to a Zoom video conference with Mr. Blaschka and informed Mr. Peak that he was being laid off from his employment with TigerGraph, purportedly due to "Covid 19."

88.     Mr. Peak was the only TigerGraph sales representative who was laid off from work, despite that he was the highest producer of business.

89.     TigerGraph quickly replaced Mr. Peak with a new sales representative soon after discharging Mr. Peak form employment.

90.     TigerGraph took out and received a federal Paycheck Protection Program loan which paid for payroll including Mr. Peak's had Mr. Peak been retained; thus, there weas no reason for TigerGraph to discharge Mr. Peak for economic reasons.

91.     In their termination of Mr. Peak's employment, TigerGraph, Mr. Blaschka and Mr. Xu were motivated by a desire to avoid paying commissions that were due or would have been due to Mr. Peak for his efforts in creating and developing new business with Optum.

92.     TigerGraph failed to pay Mr. Peak for wages or commissions earned and due.

93.     Mr. Peak has satisfied all administrative agency filing perquisites and has exhausted his administrative remedies.


## **Count I – Breach of Contract/Covenant of Good Faith and Fair Dealing**

### **(Peak vs. TigerGraph)**

94.     Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

95.     Mr. Peak and TigerGraph entered into an employment agreement in January 2018.

96.     Mr. Peak and TigerGraph entered into a compensation agreement in 2018.

97.     TigerGraph intentionally and in bad faith deprived Mr. Peak of the benefits of the employment agreement and the 2018 compensation agreement including but not limited to by changing the terms of compensation agreement in order to avoid paying Mr. Peak commissions pursuant to the 2018 compensation agreement.

98.     TigerGraph intentionally and in bad faith deprived Mr. Peak of the benefits of the employment agreement and the 2018 compensation agreement as well as their 2019 and 2020 compensation agreements including but not limited to by changing the terms of compensation agreement and discharging Mr. Peak from employment in order to avoid paying Mr. Peak commissions pursuant to the 2018 compensation agreement.

99.     TigerGraph terminated Mr. Peak's employment in May 2020 without good cause, which resulted in TigerGraph's deprivation of compensation to Mr. Peak for past services and a large windfall and/or potential windfall to TigerGraph, without the burdens of paying Mr. Peak his rightly earned commissions from the soon-to-be completed Optum business.

100.   TigerGraph acted in bad faith in terminating Mr. Peak's employment to avoid payment of sales commissions.

101.   TigerGraph's bad faith termination of Mr. Peak's employment to avoid payment of sales commissions resulted in an unearned windfall to TigerGraph of compensation/ commissions earned by Mr. Peak.

102.   In terminating Mr. Peak's employment, TigerGraph acted with intent to deprive Mr. Peak of benefits earned but not received.

103.   In terminating Mr. Peak's employment without good cause, TigerGraph improperly denied Mr. Peak future payment for past services.

104.   TigerGraph's actions were intentionally unfair and deceptive.

105.   TigerGraph acted unreasonably and in bad faith.

106.   As a direct cause and result of TigerGraph's breach of contract and the covenant of good faith and fair dealing,  Mr. Peak has sustained suffered great economic harm and has lost the benefits of the agreements he made with  TigerGraph, including but not limited to lost commissions, and other benefits.

WHEREFORE, the plaintiffs seek judgment against the defendant TigerGraph in the amount of $11,480,000.00 or the damages to be determined by a jury or the Court, and multiple damages, plus interest, and reasonable attorney's fees and costs.

## Count II – Intentional Interference with Contractual Relations

### (Peak v. Todd Blaschka)

107.   Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

108.    Mr. Blaschka knowingly induced TigerGraph to breach its contracts with Mr. Peak, and did so by employment of improper and unlawful means.

109.    As a direct cause and result of Mr. Blaschka's intentional interference with Mr. Peak's contractual relations, Mr. Peak has sustained suffered great economic harm and has lost the benefits of the agreements he made with TigerGraph, including but not limited to lost commissions, and other benefits.

WHEREFORE, the plaintiffs seek judgment against the defendant Todd Blaschka in the amount of $11,480,000.00 or the damages to be determined by a jury or the Court, and multiple damages, plus interest, and reasonable attorney's fees and costs.

## Count III – Intentional Interference with Contractual Relations

### (Peak v. Yu Xu)

110.    Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

111.    Mr. Xu knowingly induced TigerGraph to breach its contracts with Mr. Peak, and did so by employment of improper and unlawful means.

112.    As a direct cause and result of Mr. Xu's intentional interference with Mr. Peak's contractual relations, Mr. Peak has sustained suffered great economic harm and has lost the benefits of the agreements he made with TigerGraph, including but not limited to lost commissions, and other benefits.

WHEREFORE, the plaintiffs seek judgment against the defendant Yu Xu in the amount of $11,480,000.00 or the damages to be determined by a jury or the Court, and multiple damages, plus interest, and reasonable attorney's fees and costs.

## Count IV – Civil Conspiracy

### (Peak v. all defendants)

113.    Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

114.    During the years 2018 through 2020, and at various and diverse other times, TigerGraph, Mr. Blaschka and Mr. Xu did conspire, combine, and agree with one another to accomplish an unlawful purpose or a lawful purpose through unlawful means.

115.    During the years 2018 through 2020, and at various and diverse other times, TigerGraph, Mr. Blaschka and Mr. Xu did conspire, combine, and agree with one another to breach their contracts with Mr. Peak, and to perpetrate misrepresentation on Mr. Peak.

116.    During said times, the defendants conspired and combined to misrepresent to Mr. Peak the extent and true nature of TigerGraph's motives including in terminating his employment in order to improperly and unlawfully gain a windfall for themselves.

117.    During said times, the defendants conspired to interfere with the contracts they had with Mr. Peak.

118.    The defendants' conspiracy caused Mr. Peak to incur a great amount of economic loss.

WHEREFORE, the plaintiffs seek judgment against the defendant Yu Xu in the amount of $11,480,000.00 or the damages to be determined by a jury or the Court, and multiple damages, plus interest, and reasonable attorney's fees and costs.

## Count V – Violation of the Massachusetts Wage Act
## in violation of M.G.L. Chapter 149, §§ 148, 150

### (Peak v. TigerGraph)

119.    Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

120.    TigerGraph failed to pay the Plaintiff the full amount of his earned wages and commissions when they became due and payable.

121.    TigerGraph violated the Massachusetts Wage Act, M.G.L. Chapter 149, §§ 148, 150.

        WHEREFORE, the plaintiffs seek judgment against the defendant TigerGraph in the trebled amount of $34,440,000.00 or the damages to be determined by a jury or the Court, plus interest, and reasonable attorney's fees and costs.

## Count VI – Violation of the Massachusetts Wage Act
## in violation of M.G.L. Chapter 149, §§ 148, 150

### (Peak v. Todd Blaschka)

122.    Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

123.    By and through actions of Mr. Blaschka, TigerGraph failed to pay the Plaintiff the full amount of his earned wages and commissions when they became due and payable.

124.    Mr. Blaschka violated the Massachusetts Wage Act, M.G.L. Chapter 149, §§ 148, 150.

WHEREFORE, the plaintiffs seek judgment against the defendant Todd Blaschka in the trebled amount of $34,440,000.00 or the damages to be determined by a jury or the Court, plus interest, and reasonable attorney's fees and costs.

## Count VII – Violation of the Massachusetts Wage Act
## in violation of M.G.L. Chapter 149, §§ 148, 150

### (Peak v. Yu Xu)

125.    Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

126.    By and through actions of Mr. Xu, TigerGraph failed to pay the Plaintiff the full amount of his earned wages and commissions when they became due and payable.

127.    Mr. Xu violated the Massachusetts Wage Act, M.G.L. Chapter 149, §§ 148, 150.

WHEREFORE, the plaintiffs seek judgment against the defendant Yu Xu in the trebled amount of $34,440,000.00 or the damages to be determined by a jury or the Court, plus interest, and reasonable attorney's fees and costs.

### PLAINTIFFS CLAIM TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,
For the plaintiff,


/s/      Sol J. Cohen
Sol J. Cohen
BBO # 630776
KERSTEIN, COREN & LICHTENSTEIN, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
(781) 997-1600
e-mail: scohen@kcl-law.com